IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| BRONCHEE CATHCART, § | |
| § | |
| Plaintiff, § | |
| § | CIVIL ACTION NO. 3:16-cv-02084-M |
| v. § | |
| § | |
| YP ADVERTISING & PUBLISHING § | |
| LLC, § | |
| Defendant. § | |

**PLAINTIFF'S RESPONSE AND BRIEF IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

COMES NOW, Plaintiff Bronchee Cathcart, by and through his counsel, and files this response in opposition to Defendant's Motion for Summary Judgment and Brief in Support (Dkt. Nos. 16 and 17). Plaintiff would urge the Court to deny the motion as to Cathcart's claims under the Family & Medical Leave Act (retaliation) and as to disability discrimination under Texas Labor Code Chapter 21. Cathcart is waiving his claim for FMLA interference.

# TABLE OF CONTENTS

I.  SUMMARY OF RESPONSE …… 3

II. SUMMARY OF BACKGROUND FACTS …… 4

III. OBJECTIONS …… 7

IV. LEGAL STANDARD FOR CATHCART'S CLAIMS …… 7

    FMLA Retaliation …… 7

    TCHRA Disability Discrimination …… 8

V. ARGUMENT & AUTHORITIES …… 8

    A.  YP demonstrated no genuine intention of returning Cathcart to work. … 8

    B.  YP denied Cathcart the opportunity to examine and dispute alleged unauthorized claims, that is provided to non-disabled employees. …… 9

    C.  The proffered reason for termination – the 4 final alleged unauthorized claims – is not legitimate. …… 11

    D.  Cathcart's lost wages claim should not be cut off at January 31, 2016. …… 13

PRAYER FOR RELIEF  …… 13

## I.  SUMMARY OF RESPONSE

With respect to Cathcart's retaliation claim under the Family & Medical Leave Act as well as disability discrimination under the Chapter 21 of the Texas Labor Code, Cathcart asserts that YP had no intention of returning him to work. The critical issue in this case is the fact that Cathcart was terminated upon his return from medical leave. Because he was out on medical leave due to a disability, YP intentionally denied him the opportunity to research and dispute the bases on which they claim he was terminated. This is a benefit was provided to all of Cathcart's non-disabled colleagues in the normal course of their work. Not only does Cathcart dispute that he engaged in unauthorized claims, but YP cannot show anything to substantiate that Cathcart did anything wrong, making their proffered reason for termination not legitimate. Instead of treating him as any non-disabled employee and returning him to work, with an opportunity to work with his manager and review the allegedly unauthorized claims to dispute them, they let him return to work on a pro forma basis and promptly fired him. YP retaliated against him because he, as a disabled person, was no longer useful for their declining business. YP deemed him disposable and used his disability-related leave as an opportunity to shed one more sales rep from its faltering business. YP retaliated against him for taking FMLA leave and discriminated against him due to his disability under Chapter 21 of the Texas Labor Code. The Court should deny YP's summary judgment motion as to those claims.

## II. SUMMARY OF BACKGROUND FACTS

Cathcart worked in sales with advertiser YP. He generally agrees with the facts as set out by YP, until the description of events beginning in October 2014.

He has had diverticulitis since 2008, and had told YP upon hire. Exh. A, 144:25-145:14. He had already missed a substantial period of work previously when he was in the hospital in December 2013- January 2014. *Id.* YP is correct about the basis for Cathcart's sudden, final period of disability leave – he found out on October 9, 2014 during a routine dentist appointment that his blood pressure was dangerously high, and went out on leave beginning the following day. Both his diverticulitis and his hypertension are disabilities under the Americans With Disabilities Act (and therefore Chapter 21 of the Texas Labor Code as well). His October 10, 2014 leave may very well have taken YP by surprise. However, in a Confidential Record of Discussion (akin to a "write up") that had been drafted on or before October 6, 2014 on Cathcart – three days before he found out he needed disability leave – YP already, amazingly references his CRD as a "Disability"-related CRD. YP's MSJ Appendix, Dkt. No. 18, Exh. G, pgs. 38-40 (also see insert above). This shows that YP was *already* thinking about Cathcart as a disabled burden to the company, given his announced medical conditions and prior medical leave.[1]

The Court should keep in mind that during that time that Cathcart worked for YP, the company was in the process of consolidating and downsizing, as its revenues were decreasing.

---

[1] In its Motion for Summary Judgment, YP claims that "[a]ll evidence proves that YP was contemplating termination before Cathcart ever requested FMLA leave." Dkt. No. 17, p. 17. This is essentially false. Tiffany Ruff, who terminated Cathcart, testified that Cathcart was not going to be terminated based on the incidents described in the October 6, 2014 CRD (which was only 4 days prior to his final disability leave)", and that he was terminated only based on the alleged incidents in the final, April 2, 2015 CRD. Exh. B, 49:18-50:10.

Exh. B, 32:22 - 33:5; 62:10-64:19. In fact, during Cathcart's employment, 7 managers at his worksite were laid off at one time. Exh. B, 32:22 - 33:5. By January 31, 2016, approximately 10 months after Cathcart's termination, YP closed his worksite, laid off most – but not all - of the sales reps, and moved those remaining sales reps to another worksite. Exh. B, 15:19-16:21; 62:10-64:19. YP had every motivation to find an excuse to shed people like Cathcart, who had undoubtedly caused his managers inconvenience with his disability-related leave events and unpredictable medical circumstances. They didn't even replace him after they fired him. Exh. C, YP's Response to Interrogatory No. 3.

In its recitation of alleged facts, YP goes to great lengths to describe Cathcart's disciplinary history with YP. That's understandable in a wrongful termination case – but it's not really relevant here. Regardless of whether the prior alleged unauthorized claims scored against Cathcart in the past are accurate or not – Cathcart does not dispute that as of October 2014, he was aware that he could be terminated for future unauthorized claims. However, YP had no genuine intention of returning him to work after his leave, and in fact denied him opportunities provided to other sales reps who are not disabled in order to ensure they could generate a purported basis to terminate him.

Cathcart was, for all practical purposes, off work from October 10, 2014, through April 2, 2015. Exh. A, 86:22-25. He was unable to perform the functions of his position from October 10, 2014 through March 12, 2015. Exh. A, 110:3-6. He returned on or around March 11, 2015, to what he thought was his job. However, he couldn't log in using his standard credentials and was not able to get back to his work that day. Exh. A, 136:8-137:6. Tiffany Ruff, a Senior Sales Manager who was, in her words, responsible for "pretty much the entire operations of the call center," sent him home around noon since he had no login access. Exh. A, 106:7-21. The

following day, he returned, and Ruff sent him home with a medical questionnaire to be completed by his physician regarding his return to work status. Exh. A, 106:24-107:13. Ruff then authorized Cathcart to return to work on April 2, 2015, at which time she promptly terminated him. Exh. A, 110:15-112:12. He was fired with zero chance to review the purported unauthorized claims that allegedly were the basis for his termination.

### III. OBJECTIONS

1.     Cathcart hereby OBJECTS on the basis of HEARSAY to the internal YP data listed next to each account name (Corbitt, Aroesty, ETC and Hardin) in the April 2, 2015 CRD, attached to YP's MSJ Appendix (Dkt. No. 18) as Exh. H (pgs. 041-042). These notations were not written by Ruff, and Ruff has no first-hand knowledge on any of these accounts and Cathcart's activity with respect to any of these accounts except the Corbitt account. Exh. B, 79:25-81:7; see also Exh. C, YP's Responses to Interrogatory Nos. 4, 5 and 6, showing the names of the individuals who apparently created these records. Therefore, that content is hearsay and should be stricken from the exhibit. It is being offered for the truth of the matter asserted – to demonstrate a purported "legitimate, non-discriminatory basis" for firing him – and is therefore inadmissible.

### IV. LEGAL STANDARD FOR CATHCART'S CLAIMS[2]

**FMLA Retaliation:**[3] To survive summary judgment under the mixed-motive burden-shifting framework, an employee must first make a prima facie case of FMLA retaliation. *Richardson v. Monitronics Int'l, Inc.,* 434 F.3d 327, 333 (5th Cir. 2005). The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* If the employer carries this burden, the burden shifts once more to the employee to offer sufficient

---

[2] As the Court is well aware of the summary judgment standard under FRCP 56, Cathcart will not repeat it here.
[3] Although Cathcart was returned to work only long enough to fire him, Cathcart believes such conduct is better characterized as a retaliation claim, and therefore will not respond on the issue of FMLA interference in his response.

evidence to create a genuine issue of fact that the employer's reason, although true, is but one of the reasons for its conduct, another of which was discrimination. *Ion v. Chevron USA, Inc.,* 731 F.3d 379, 390 (5th Cir. 2013). Cathcart presumes that all three prongs are in contention.

**TCHRA Disability Discrimination:** The ADAAA prohibits discrimination in employment against a qualified individual on the basis of his disability. 42 U.S.C. § 12112(a). The ADAAA and TCHRA both prohibit disability discrimination and "Texas courts look to analogous federal precedent for guidance when interpreting the [TCHRA]." *Rodriguez v. ConAgra Grocery Prods. Co.,* 436 F.3d 468, 473-74 (5th Cir. 2006) (quotations omitted). Thus, federal courts look to federal precedent in decisions on the ADAAA in interpreting the TCHRA. *Id.* To recover under the ADA, the plaintiff must prove that he was discriminated against on the basis of his disability. See *Holtzclaw v. DSC Commc'ns Corp.,* 255 F.3d 254 258 (5th Cir. 2001); *McInnis v. Alamo Cmty. Coll. Dist.,* 207 F.3d 276, 282 (5th Cir. 2000); *Gonzales v. City of New Braunfels,* 176 F.3d 834, 836 (5th Cir. 1999). Since plaintiff has adduced only circumstantial evidence to prove his disability discrimination claim under his TCHRA claims, the *McDonnell Douglas* burden-shifting framework applies and to prevail on these claims, plaintiff must prove: (1) he has a disability, (2) he is qualified for the job, and (3) defendant made an adverse employment decision because of plaintiff's disability. *Neely v. PSEG Texas, Ltd. P'ship,* 735 F.3d 242, 245 (5th Cir. 2013). Based on YP's Motion for Summary Judgment, only the third prong appears to be in contention.

## V. ARGUMENT & AUTHORITIES

**A. YP demonstrated no genuine intention of returning Cathcart to work.**

There is more than a scintilla of evidence that YP had no intention of genuinely restoring Cathcart to work after either his FMLA leave, or his overall disability-related leave:

1) The YP internal notations on one of the accounts that allegedly caused Cathcart's termination, refers to him – on December 8, 2014, before his FMLA leave had even expired – as a "going away rep" – meaning, that he is on his way out of the company. Exh. A, 184:3-6; YP's MSJ Appendix Exh. H, pgs. 41-42 (Dkt. No. 18) (see also, insert below).

> Aroesty Steven M Law Office   12/10/2014--Claim for
> behalf of GAR  Cathcart  12/08/2014--**open** Custo

2) In another such YP internal notation, from January 23, 2015, the YP service rep states that Cathcart is no longer with the company. *Id.* (see also, insert below).

> within cancellation time frame, the account was never cancelled and rep is no longer with the company.  The Account notes in the system read: reclosed due to

3) Ruff testified that when an employee returns from extended medical leave, they are assigned new accounts to work when they return. Although Ruff told him to return to work on April 2, nothing at all had been done during his entire leave period to assign him accounts for his return. Exh. B, 64:8-64:19. In fact, Ruff suggested that Cathcart's accounts would have been assigned to other sales reps, and that she couldn't guarantee that he would have any accounts to return to after his leave. Exh. B. 16:61-24.

4) The October 6, 2014 CRD (reissued on April 2, 2014 by YP's strikethrough and notations), literally referred to his write-up as a "Disability" write-up – before Cathcart even went on the unexpected final period of medical leave. Defendant's MSJ Appendix, Dkt. No. 18, Exh. G (pgs. 38-40).

**B. YP denied Cathcart the opportunity to examine and dispute alleged unauthorized claims, that is provided to non-disabled employees .**

In her declaration attached to YP's Motion for Summary Judgment, Ruff said the following, about the opportunity for sales reps to dispute alleged unauthorized claims:

> 11. YP sales team members have multiple opportunities to dispute unauthorized claims. They may first dispute the claim at the time their supervisor addresses it. If they dispute the claim, the claim and dispute are reviewed by YP management. If YP management rejects the dispute at that point, the sales team member may appeal the decision.
>
> 12. If YP detects an unauthorized claim when a sales team member is on leave, depending on the level of seriousness, YP generally waits until the sales team member returns to work to address the claim with the team member.

(Dkt No. 18, p. 7.) In addition, both Ruff and Cathcart testified extensively on the steps that a sales rep could and would take to determine whether or not an unauthorized claim was substantiated, including reviewing the voice verifications, recorded calls, and faxes from the customers. Exh. B, 21:2-30:10; Exh. A, 184:15-187:16. Ruff testified that a sales rep is typically given at least an opportunity to research the claim before they're terminated based on that claim, and they're permitted to do this research during work time. Exh. B, 83:3-13. YP refused to provide Cathcart with these opportunities due to his disability and/or disability-related leave. "In assessing discriminatory motive [in an FMLA retaliation action], a court may also consider other factors, including ... '[d]epartures from the normal procedural sequence ...' " *Hudgens v. Gen. Dynamics Corp.,* 144 F.3d 151, 168–69 (1st Cir.1998), citing *Reno v. Bossier Parish Sch. Bd.,* 520 U.S. 471, 489 (1997). Furthermore, there is a fact issue as to whether YP, in good faith, reasonably believed the customer's alleged reports of complaints, given that they refused to allow Cathcart to research the allegations before his termination. See *Brown v. Louisiana Lottery Corp.,* 240 F. Supp. 2d 590, 598 (M.D. La. 2002) (fact issue as to whether employer believed another's story about the plaintiff-employee reasonably, and in good faith).

When Cathcart returned to work on April 2, 2015, Ruff read to him, word-for-word, the CRD dated April 2, 2015, at Defendant's MSJ Appendix, Exh. H (pgs. 41-43), which ends by

terminating him, and instructing Cathcart to pack up his things and leave. Exh. B, 52:13-16. She provided Cathcart with absolutely no opportunity to review or dispute his claims. Furthermore, she had already prepared it before he returned from leave. Exh. B, 50:14-21; 51:24-52:3. The fact that Cathcart was terminated immediately upon his return is probative evidence of retaliation. See *Carroll v. Sanderson Farms, Inc.,* 2012 WL 3866886, at *20 (S.D. Tex. Sept. 5, 2012) (employee terminated the day she returned from FMLA leave was a "highly suspicious" "temporal connection"). When evaluating whether the adverse employment action was causally related to the FMLA protection, the court shall consider the temporal proximity between the FMLA leave, and the termination. *Mauder v. Metro. Transit Auth. of Harris Cty., Tex.,* 446 F.3d 574, 583 (5th Cir. 2006). Temporal proximity is sufficient for a prima facie showing of FMLA retaliation. *Lister v. Nat'l Oilwell Varco, L.P.,* No. CIV.A. H-11-01, 2013 WL 5515196, at *30 (S.D. Tex. Sept. 30, 2013); see also *Grubb v. Sw. Airlines,* 296 F. App'x 383, 390 (5th Cir. 2008) (employee fired 2 weeks after FMLA leave request demonstrated a prima facie FMLA retaliation case).

Shockingly, YP has a policy that punishes someone like Cathcart for being off work for too long of a period while an allegation of an unauthorized claim is pending. Exh. B, 83:23-85:4. If the employee doesn't return in time to review and potentially dispute the claim, it will, by default, be counted against them, as these 4 final claims were counted against Cathcart. *Id.* While Ruff suggested that the same thing that happened to Cathcart could happen to someone on vacation leave, she admitted that she had never seen anyone terminated upon returning from vacation based on an unauthorized claim that they didn't have time to review. *Id.* What happened to Cathcart was unique, and was related directly to the fact that he was on disability leave.

**C. The proffered reason for termination – the 4 final alleged unauthorized claims – is not legitimate.**

Ruff makes it clear that Cathcart was ultimately terminated based on the 4 alleged unauthorized claims in the CRD dated April 2, 2015, included as Exh. H (pgs. 182-183) in YP's MSJ Appendix, Dkt. No. 18. Exh. B, 53:22-54:11. Those four accounts are Corbitt, Aroesty, ETC, and Harden.

First, without the hearsay within YP's MSJ Appendix Exh. H (Dkt. No. 18, pgs. 41-43), YP has presented no basis to support the claimed reason for termination. In fact, the purported notes for the ETC account don't even mention Cathcart. Exh. A, 67:1-25. And the purported notes for the Aroesty account do not state when and how the customer supposedly canceled the account. Exh. A, 77:16-78:4. If the customer had left Cathcart a voicemail cancelling the account – which does occur – while he was on leave, that would not be a legitimate basis to terminate him. Exh. A, 77:21-25. Again, YP provided Cathcart with no opportunity to review the allegations – they just fired him, unlike what they do for non-disabled employees who do not take such leave. And Ruff testified she has no firsthand knowledge of any events connected to the Aroesty, ETC or Hardin accounts.

And, in the event the data on the Corbitt account is deemed admissible evidence, the notation shows clearly that Cathcart was scheduled to terminate the Corbitt account as of October 10, 2014. Defendant's MSJ Appendix, Dkt. No. 18, Exh. H (p. 182). However, as YP knows, Cathcart was already on emergency medical leave at that time and therefore wasn't present at work to do such a cancellation on October 10. Exh. B, 61:5-7. Therefore, at that point, Ruff admits that Cathcart's supervisor, Patty Williams, was responsible for the account. Exh. B, 61:5-7; 60:14-25. Although YP claims that Cathcart hasn't shown that he wasn't responsible for the unauthorized claims, Cathcart denied that he was responsible for any purported unauthorized claims or that the customers in question requested cancellations. Exh. A, 183:15-190:5.

Furthermore, Ruff repeatedly testified that she has no idea where any of the materials that would be used to verify YP's allegations – the recorded calls, faxes from the customers, voice mails, etc. – are located or if they even still exist (presuming they ever did). Exh. B, 27:22-28:2; 33:13-20; 67:12-68:2.

**D.  Cathcart's lost wages claim should not be cut off at January 31, 2016.**

Ruff testified that, although Cathcart's worksite was closed as of January 31, 2016, and a majority of the sales reps were laid off, YP retained some of the sales reps to continue working for YP at another location. There is a fact issue as to whether Cathcart may have continued at another YP work location like some of his colleagues.

### PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff Cathcart requests that the Court deny YP's Motion for Summary Judgment as to Cathcart's FMLA retaliation claim and Cathcart's Texas Labor Code Chapter 21 disability discrimination claim, and grant Cathcart any other relief to which he may be entitled.

Respectfully Submitted,

/s/ Kerry V. O'Brien

**Kerry V. O'Brien**
Texas Bar No. 24038469
Board Certified in Labor & Employment Law by the TBLS



1011 Westlake Drive
Austin, Texas 78746
email: ko@obrienlawpc.com
phone: (512) 410-1960
fax: (512) 410-6171

**COUNSEL FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on this, the 12th day of May 2017, the foregoing document was served via the CM/ECF system to the following registered users:

Janet A. Hendrick
FISHER & PHILLIPS LLP
500 North Akard St., Suite 3550
Dallas, TX 75201
Phone: (214) 220-8326
Fax: (214) 220-9122
Email: jhendrick@laborlawyers.com

COUNSEL FOR DEFENDANT

/s/ Kerry V. O'Brien
Kerry O'Brien